# IN THE COURT OF APPEALS OF IOWA

No. 22-0464
Filed September 21, 2022

**JEREMY J. BOWMAN,**
Petitioner-Appellant,

**vs.**

**DENYEL L. DOUGHMAN, a/k/a DENYEL L. JONES,**
Respondent-Appellee.

_____

Appeal from the Iowa District Court for Pottawattamie County, James S. Heckerman, Judge.

The father appeals the physical care determination of the district court.

**AFFIRMED AS MODIFIED AND REMANDED FOR FURTHER PROCEEDINGS.**

Stephen Babe of Cordell Law, LLP, Des Moines, for appellant.

J. Joseph Narmi and Tricia Scheinost (until withdrawal), Council Bluffs, for appellee.

Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

Primarily because of the mother's, Denyel Jones, move to Arizona, the father, Jeremy Bowman, petitioned for joint legal custody and physical care of the child[1] this never-married couple had together. After the district court granted physical care to Denyel, Jeremy appealed. In addition to his request we reverse course on the physical-care issue, Jeremy asks for an award of appellate attorney fees. Denyel requests appellate attorney fees as well. After our de novo review of the evidence, we modify the district court's physical-care determination to give it to Jeremy but decline to order appellate attorney fees to either party.

**Factual Background.**

When Denyel was pregnant with their child, the parents, who were living together, separated. While they dispute Jeremy's involvement with the child in the early years, both testified Jeremy was involved again in 2010, when the then two-year-old child was removed by the Iowa Department of Services (DHS) from Denyel because of her methamphetamine use. And, both agreed Jeremy spent even more time with the child after the child reached age six, such that in the two years before the custody trial, Jeremy and the child were together every weekend and the majority of the summer in 2021.[2]

Then, in September 2021, Denyel moved to Arizona with her fiancé, who was previously her husband; his twelve-year-old son; her adult son; and the child

---

[1] Their twelve-year-old child was born in late 2009. Both parents have an adult child from other relationships—Denyel's adult son lives with her, and Jeremy's adult son lives in the same city as Jeremy.

[2] Jeremy testified he had care the majority of the summer of 2020, but Denyel disputed that characterization.

at subject here. The child was not yet enrolled in any Arizona school and, when the family arrived in Arizona, they lived twenty-five days in two hotel rooms while waiting for their real estate closing on their home. Denyel did not tell Jeremy about her planned move until August and did not include him in the decision over what school the child would attend. Even more concerning, Jeremy was not listed on the school contact records. To block the move, Jeremy applied for a temporary restraining order and for temporary legal custody and physical care as neither parent had ever sought a formal custodial order.[3] The district court denied the injunction request, thus allowing the child to move, and awarded Denyel temporary physical care.

Even though there was no formal custodial order, the parents had worked together through the years to co-raise the child with little conflict. Yet the move to Arizona revealed seams that were straining. For example, as the pandemic hit and the child navigated online learning, it became apparent to Jeremy that the child fell behind in school such that it was impacting his overall performance. Likewise, Jeremy testified he noticed a decline in the hygiene and dental health of the child. As Jeremy described it, the child rarely showered and often did not brush his teeth until the child came to his home for the weekend. Without much protest to these facts, Denyel alluded to the child's hygiene, testifying, "He—there's times where he absolutely refuses to do it at all. But—and I'm like I can't force him—can't strip

---

[3] An October 2010 order established Jeremy's paternity along with the child and medical support he was obligated to pay. The parties never sought any formal custody, physical care, or visitation award until September 2021.

him of his clothes because I'll get in trouble with that, throwing him in the shower, because he's 12 years old."

Adding to Jeremy's concern, in July, while he had care of the child, Denyel called Jeremy intoxicated, crying that she was going to jump off a bridge and the child would be better with Jeremy. Although she remembers none of the conversation, Jeremy was concerned enough that he called the police and Denyel was hospitalized. Part of her anger and distress that day involved a fight she described having with her fiancé. Denyel told Jeremy the fiancé called her "worthless" and "unfit." Jeremy kept the child the remainder of the summer term. And at trial, Jeremy noted that child protective services handled several other matters at Denyel's home. One resulted in a founded child abuse finding—although unknown against whom—because keys were thrown and hit a child. Another incident, according to Jeremy, involved the fiancé chasing Denyel with a rifle, which Denyel testified is, for whatever reason, no longer in the home. Finally, Jeremy and Denyel discussed a problem with her fiancé's child, where it was alleged that children "played inappropriately" with each other and that they could no longer share a room together. Denyel testified that the situation was handled so that no inappropriate touching had occurred "since [she] first found out about it. They're not even in the same room any more unless they are supervised." Yet, they did share a hotel room while the family waited days for access to the Arizona house.

To address her strengths, Denyel testified she performed as the primary caretaker for all of the child's twelve years and that they have a very close relationship. She believed that the child's heart would be broken if he was taken

away from her. She also pointed out that Jeremy did not attend every school conference and rarely attended the child's individualized-education-program (IEP) sessions at the school.

The parties proceeded to trial in January 2022.[4] Without providing any analysis as to the reasons considered, the district court awarded the parties joint legal custody with physical care to Denyel.[5] The order outlined Jeremy's visitation schedule, which essentially gave him most of the child's summer break from school[6] and some other school breaks and holidays. The court ordered each party to pay the travel costs to retrieve the child but gave Jeremy a five percent deviation in the revised child-support obligation in consideration of those additional costs for transportation for the visits. Jeremy timely appealed.

**Physical-Care Determination.**

Because custody matters are tried in equity, our review of these proceedings is de novo.[7] Iowa R. App. P. 6.907. "[W]e examine the entire record and decide anew the issues properly presented." *In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005). "Although we give weight to the factual findings of the district court, we are not bound by them." *In re Marriage of Mauer*, 874 N.W.2d

---

[4] The record reflects that the district court had a telephonic in camera conference with the child, but there is no transcribed record of the discussion and no mention of it in the court's decision except to note that the court relayed its conversation with the child to counsel.

[5] The parties do not challenge the award of joint legal custody.

[6] The parties agreed in mediation that the "parent who does not enjoy primary care of the child" would have this summer visitation arrangement.

[7] When making physical-care determinations under Iowa Code chapter 600B (2021), which is used to reach paternity, custody, and physical-care determinations of children whose parents never married, we apply the factors set out in section 598.41(3), which governs custody and physical-care determinations in dissolution proceedings. Iowa Code § 600B.40(2).

103, 106 (Iowa 2016); *see also* Iowa R. App. P. 6.904(3)(g).  Because we do not have the benefit of the trial court's analysis of witness behavior or creditability, we use our de novo review particularly here to consider the factors that are essential for successful child-rearing.

But first, there is no question from our de novo review of the record that these parents both have a close, loving relationship with the child.  Denyel has raised the child in her home for most of the child's twelve years, except for when DHS was involved.  For the last seven years, Jeremy has exercised visitation with the child almost every weekend and for extended time in the summers, including the full summer of 2021.  Although he did not start out strong with his connection with the child, it seems clear that it is now there.  In fact, Denyel has used this close relationship as a punishment by denying the child a visit with his father when he would not clean the bedroom or do homework.  Not only does this discipline technique show the importance of the relationship with the father and son, but it works against Denyel's duty to provide maximum contact between the father and son.  *See Bailey v. Rinard*, No. 17-1055, 2017 WL 6026469, at *3 (Iowa Ct. App. Nov. 22, 2017) ("[A] parent's willingness to encourage contact with the noncustodial parent is a critical factor in determining custody." (alteration in original) (citation omitted)).  But the tension here boils up because of the residences of the parties—Jeremy lives in Iowa, where the child has lived since birth, and Denyel now lives in Arizona.  So, we look to the record to glean their respective abilities to provide a stable home that will ensure the best environment for the child.

When deciding who should have physical care, we do not resolve the issue "upon perceived fairness to the [parents], but primarily upon what is best for the *child.*" *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). "The objective of a physical care determination is to place the child[] in the environment most likely to bring [the child] to health, both physically and mentally, and to social maturity." *Id.* "When determining who will have physical care of the child, we will consider 'stability and continuity with an eye toward providing the [child] with the best environment possible for [the child's] continued development and growth.'" *Meller v. Hendrickson*, No. 19-1096, 2020 WL 374565, at *2 (Iowa Ct. App. Jan. 23, 2020) (alterations in original) (quoting *Hansen*, 733 N.W.2d at 700). "[T]he factors of continuity, stability, and approximation are entitled to considerable weight." *Id.* (alteration in original) (quoting *Hansen*, 733 N.W.2d at 700).

As to the characteristics of the child, each parent testified about the positive attributes of the child but also confirmed the struggles with educational focus and concerns over hygiene. Jeremy detailed a number of activities and interests he and the child shared, and he testified they do Sunday dinner with his mother most weekends. He and others testifying on his behalf addressed the close relationship between Jeremy and the child. In this record, that detail was not available as to the relationship and interests between Denyel and the child. When asked about their relationship, Denyel only said "He's my little buddy and I'm—he's a mommy's boy. There's times where I dig in or he says if you go down, I go down with you. No, you have too much to look forward to." Those statements suggest a relationship not supportive of a twelve-year-old but one where the child is holding up the parent.

But the educational concerns are the tipping point here. *See In re Marriage of Winter*, 223 N.W.2d 165, 166 (Iowa 1974) (noting that the capacity of a parent to meet the child's educational needs is a factor to consider in best-interests determinations). On the one hand, Jeremy was not attending all conferences and IEP meetings at the child's Iowa school and blamed the school staff, but the documentation from the schools does not show that Denyel has made the child's education a priority. First, during the COVID-19 pandemic, the records from the school show she did not address and solve the inability of the child to stay connected with the school, despite the school's continual requests to try and help her connect the child. By Jeremy's and his girlfriend's accounts, unrefuted by Denyel, the child was more than thirty assignments behind on his work. Yet, Denyel did not get him into an educational program in Arizona until October 20, 2020. And, without input from Jeremy, she put the child in an Arizona program where as a sixth grader, he was expected to do work at an eighth or ninth grade level. Related to this school decision, Denyel was asked:

> Q. He was behind in the fifth grade and remote learning?
> A. But he did do his school work because I made him do school work at home. He was playing catch-up. And when he went to his dad's, he was doing school work with his dad and that helped him get caught up.
> Q. So your son was struggling still though in Council Bluffs schools when he left? A. Yes.
> Q. And your position is that it's in [the child's] best interests for a child who is struggling to be enrolled in an advanced curriculum at a high school level? A. Yes.

Not surprisingly, he was failing most of his classes at the school in Arizona. Finally, Denyel told Jeremy that the move to Arizona was only going to last for up to a year

and not longer, thus if what she said is true, the child might be in yet another school in another year.

There is also considerable family support in Iowa for the child. Before he left Iowa, the school noted that the child did better when a strong relationship with adults was present. In Arizona, those adults are only his mother, Denyel's fiancé, and his older brother; whereas in Iowa, he has his father, Jeremy's long-term girlfriend, his older brother, and extended family of both parents. Jeremy indicated his significant other has a close relationship with the child and helps with the child's development, having had experience as a fourth-grade teacher.

Finally, Jeremy detailed the stability he provides the child. Stability and continuity of caregiving are important considerations in a custody decision, thus, a history of successful caretaking by the parent "is a strong predictor that future care of the [child] will be of the same quality." *Hansen*, 733 N.W.2d at 697. At Jeremy's house, the child has chores, is taught manners, works on homework; he is also required to brush his teeth, shower regularly, and wear clean clothing. Jeremy pushed for dental health care for the child that he argued Denyel ignored. In sum, considering the factors that support a custodial arrangement with the best interests of the child in mind, we find physical care shall be placed in Jeremy. "'Physical care' means the right and responsibility to maintain a home for the minor child and provide for the routine care of the child." Iowa Code § 598.1(7). "The parent awarded physical care maintains the primary residence and has the right to determine the myriad of details associated with routine living, including such things as what clothes the children wear, when they go to bed, with whom they associate or date, etc." *Hansen*, 733 N.W.2d at 691. The ultimate objective of a physical-

care determination is to place the child in the environment most likely to bring him to healthy physical, mental, and social maturity. *Id.* at 695. We find that place to be Jeremy's home. Jeremy has actively cared for the child over the last several years. The child's developmental needs can be better met by Jeremy, and Jeremy is more likely to communicate about the child's needs with Denyel. He also has supported her relationship with the child and not denied her time with the child as she has done with Jeremy's parental time. Because Denyel will now operate under the visitation schedule established for Jeremy, Denyel will remain responsible for the transportation costs associated with retrieving the child for her visits. We remand to the district court to calculate the child-support obligation of Denyel, with the same deviation applied to Jeremy because of the transportation costs.

**Appellate Attorney Fees.**

Both parties request appellate attorney fees. "An award of appellate attorney fees is within the discretion of the appellate court." *Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005). When determining if appellate attorney fees should be awarded the court considers "the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal." *Id.* (quoting *In re Marriage of Ask*, 551 N.W.2d 643, 646 (Iowa 1996)). Citing her efforts to defend the district court's decision, Denyel asserts she should be awarded fees under Iowa Code section 598.36.[8] But because we reversed the district court ruling, we do not award

---

[8] While Denyel references the attorney fee language applicable to a dissolution of marriage proceeding and while the language is nearly identical, Iowa Code section 600B.26 actually applies here where the parties never married. Section 600B.6 reads: "In a proceeding to determine custody or visitation, or to

Denyel her appellate attorney fees. And while Jeremy prevailed against Denyel, we find that with the transportation cost expense she now will cover, she does not have the means to pay fees despite Jeremy's success on this appeal. *See In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013). So, we award no appellate attorney fees in this case.

**Conclusion.**

We modify the district court's ruling to award Jeremy physical care of the child and give Denyel visitation as established by agreement of the parties and under the conditions provided in the ruling for Jeremy's visitation. We order Denyel to pay all costs of transportation for her visitation. We remand for further proceedings to determine the child-support award.

**AFFIRMED AS MODIFIED AND REMANDED FOR FURTHER PROCEEDINGS.**

---

modify a paternity, custody, or visitation order under this chapter, the court may award the prevailing party reasonable attorney fees."